Mr. Levitt, you've got two minutes for rebuttal, which gives you eight minutes out of the gate. Before we start, is it Stegman or Stegaman? Stegman. Stegman. Joshua Stegman. That second E is not accepted. As far as I know, Your Honor. No, that's good to know. Thank you. Thank you. I assume you know better than I, anyway. That may not be so, but. You may proceed. Good morning, Your Honors. I'm Richard Levitt, along with Zach Siegel. We represent Mr. Stegman on appeal pursuant to this court's grant of a certificate of appealability from the denial of his 2255 petition. We raise a single issue of ineffectiveness of counsel, which is divided essentially into four parts. This morning, I want to focus on our first issue concerning the advice that was given to Mr. Stegman by his attorney concerning a cooperation agreement, and also on count four concerning whether or not he's a career criminal. However, as I begin, I want to comment very briefly on the government's 28J letter, which the court, I think, received just a few days ago, where the government cites the Supreme Court decision in Hudson versus Michigan with regard to the flash bang issue that we raised, which is point B in our brief. I assume that Your Honors have had an opportunity to see that 28J letter. In Hudson, Your Honor, here's the core holding of Hudson. What the knock and announce rule has never protected, however, is one's interest in preventing the government from seeing or taking evidence described in a warrant. Since the interests that were violated in this case have nothing to do with the seizure of evidence, the exclusionary rule is inapplicable. So what they're saying is that where the finding of the evidence, or where the failure to knock and announce is not the but for cause of the finding of the evidence, they won't apply the exclusionary rule. That's not what happened here. And what happened here was that the police entered not only with knock and announce, but also with the use of this flash bang grenade. And it was that, we contend, which caused Mr. Stegman to run out of his house. How did it cause him to run out of his house? Because he was scared out of his mind. But what you're raising means- He left his girlfriend there, didn't he? Excuse me? Didn't the girlfriend stay? I don't think that whether one person stays and one person leaves is dispositive. To the extent there's an issue, that issue should be resolved at a hearing. It shouldn't be resolved as a matter of law, where you have the government making one argument, and you have Mr. Stegman making another argument. But so, Mr. Levitt, you're saying that there needed to be a hearing to determine whether his primary motivation was fear, prompted by the big noise, or fear of being apprehended by police. Sure, I think it was fair for the government to make that argument. But under 2255 sub D, unless the papers conclusively show that he's not entitled to relief, the court is required to hold a hearing. And I think it's important to understand, and again, I want to move on to the other issues. But it's important to understand the following with respect to these flash bang grenades. This is the way the Eighth Circuit has described it in ZJ versus Brooks, which we cite in our brief. The flash bang grenade was four times louder than a 12 gauge shotgun blast, and emits a light 107 times brighter than the brightest high beam vehicle headlight. It has a powerful enough concussive effect to break windows and put holes in walls. The flash bang burns at around 5,000 degrees Fahrenheit, creating an obvious and serious risk of burning individuals, damaging property, and starting fires, etc. So- Don't the statements that had previously been recorded, made by your client, provide sufficient justification for the use of that device? Well, no, and in our brief, we go over every single one of the allegations that are made and rebut every single one. And I would say this as well, if the police were really afraid, really afraid, and not just angry because one of their fellow officers apparently had tipped off Stegman to a prior intended search. If they really were concerned about a gun on the premises, or anything else that was occurring inside the premises, they had a very simple solution, if that was really their motive. They could have waited until he walked outside to take out the garbage, to go to a store, to do anything. And they could have arrested him then, and searched pursuant to the warrant. But they didn't do that. They decided to go in with a slot team, and helicopters, and a flash bang, and a no knock. Which, by the way, they didn't ask for the flash bang in the warrant. But they decided- My point, though, is that using the flash bang was the but-for cause of discovery of the drug evidence on the abutting property, right? Sure. Didn't you already challenge that on a direct appeal in this case? Well, not that the- Not the flash bang itself, but you challenged the discovery of the drugs on an abutting property. But that's the issue, whether or not the flash bang was the but-for cause of finding the drugs. There's no question in the evidence that they found the drugs on the Foody's property. There's no question that they wouldn't have even followed that path and searched that area, except for the fact that Mr. Stegman- Did you waive this argument by not raising it? Excuse me? Did you waive the argument? No, it's an ineffectiveness claim. I mean, so that's precisely why we're here, because counsel was ineffective in not making the argument. But to turn it from- We're looking at the reasonableness of counsel's thinking. And here we've got a situation of prior information, prior to the event of this man's dangerousness, the fact that he possessed guns, that he threatened people. So why isn't that within the realm of reasonableness sufficient? Well, if you look- I'm sorry, Your Honor. If you look at each of those rationales individually, and then collectively, you realize that none of them make any sense. For example, and I'm sorry, I respectfully ask the court to hear my argument with regard to a couple of the other arguments. But to answer the court's question directly- You've decided, you gave us the two most important arguments, but you haven't gotten to them yet. I gave you- I opened the door for you, Your Honor, I admit that. For the 26J letter. I admit I opened the door by raising the issue concerning Hudson versus Michigan. But to answer Your Honor's question, in our brief, in quite great detail, we discuss every one of those rationales. For example, they say that he was convicted of using a dangerous weapon. In fact, he wasn't convicted, he was acquitted at a trial when he was 17 years old. So it's just a misrepresentation of the record. They make various other arguments which, again, to discuss them all would take a great deal of time, but which we discuss at great length in our brief. With regard to the first issue that we raised, the advice that was given or not given to Mr. Stegman. The issue is very simple. Under 2255D, unless it's clear that he's wrong as a matter of law, he's entitled to a hearing. Not only was he not wrong- But is that true when the judge who presided over the trial is the one that made the credibility determination? Is there always a requirement for a separate evidentiary hearing? Yes. In fact, the law is entirely to the contrary. And what the law says here is that number one, if he's going to make a credibility finding, he has to state a specific reason. The only thing that the court stated, that Judge Sharp stated, was that I find him from past experience to be incredible. Well, not only does he not provide even a single example of that, not one, not a single example. But we also know that the government, after proffering him, offered him a plea agreement because they believed him, because they thought he was credible. And we also know from Judge Sotomayor's decision or her concurrence that you can't find a defendant incredible for purposes of a 2255 simply because in the past he has been incredible. Now, Mr. Stegman has never been incredible, but just accepting that. You can't deny a 2255 for that reason alone, because if you use that rationale, then you would never grant a 2255 for somebody who previously was found incredible. And here- Do you agree with the Puglisi case? Excuse me? Doesn't the Puglisi case undermine the argument you're making? I don't understand why that would be so, Your Honor. Because it holds that a less than full-fledged hearing may be permissible, where credibility assessments are made by the judge who tried the case. But the assessment has to be made based on something. He didn't allege anything. Your Honor, he cites absolutely nothing at all in support of the finding that Mr. Stegman was incredible. It sounds to me like what you're saying is that the judge, if he's not going to have a hearing then, has to basically write or state on the record the reasons for the credibility findings, setting sort of chapter and verse. Kind of like a bench trial verdict. Well, at the very least, Your Honor, I don't think, frankly, on this record, there's anything that he could have said, which is maybe why he didn't say anything at all. But certainly, he's not giving you anything upon which to review this record. Nothing at all. Your Honors are supposed to say, well, okay, he said it, so it must be so. And that's a valid basis for denying a 2255, but it's not. Another point is that Mr. Stegman, in his affidavit, said, I called Ms. Quigley's office. I spoke with Kelly McDonald, his assistant. I said, I want to cooperate. And she said to me, Mr. Stegman attests, no, I'm sorry, Ms. Quigley says that's not happening. Now, if that were not true, wouldn't we have seen an affidavit from this person in rebuttal to what Mr. Stegman had to say? But there was none. There was none, I suggest, because he had that conversation. He did ask her to cooperate, and the message that came back was no. And if you look at Ms. Quigley's affidavit, the only thing she says is, I told him the pluses, I told him the minuses, and he said he wanted a 12 to 14 cap. So my advice to him was not to take the plea. Well, that's not advice. The advice that has to be given under this court's Berea decision was whether or not it's wise not to take the plea. Counsel has to impart her wisdom to the defendant. What she should have been saying to Mr. Stegman was, you know, Mr. Stegman, or Josh, you know, you're familiar with state court proceedings, you're not familiar with federal court proceedings. Now, this is somebody, by the way, who you know, had already proffered and proffered successfully, and had a cooperation agreement in hand. And she should have said, you don't know the way federal cooperation works. Federal cooperation works as follows. You plead guilty, and you get your reward at the end. You don't get cash. Aren't you just Monday morning quarterbacking? Not at all. Not in the slightest. And not only is it not Monday morning quarterbacking, but the law is crystal clear that she has to give advice to the client concerning the wisdom of the plea. And you know, there was a decision that we cite, which was from Judge Martin several years ago, where he found the lawyer ineffective because he didn't pursue a possible cooperation agreement at the beginning of the case and waited until the end of the case when it was too late. And Judge Martin said, that was ineffective. This case is far worse, because you have a client with a cooperation agreement at hand, and you have the lawyer who at best says, I told her the pluses and told her the minuses, without us knowing, by the way, what those pluses were and what those minuses were. And simply because he said he wants a 12 to 14 cap, I said, well, Josh, then you shouldn't take the plea. There is nothing remotely competent about that advice. I think the Monday morning quarterbacking comment is sort of saying that otherwise, lawyers have been accused of coercing pleas out of their clients, and that's a problem too. So that's why the law is pretty clear that in this area, lawyers get a wide berth about what is reasonable representation concerning a plea. They can't coerce, and they can't not provide information about the plea, but otherwise they get a wide berth, don't you think? You know, Judge Sullivan, I'm sorry that the role of defense attorney is a difficult one that's fraught with all sorts of problems. It's the one that I've chosen. I accept that responsibility. If you want to say it's Monday morning quarterbacking, every habeas that's based on ineffectiveness of counsel could be said to be Monday morning quarterbacking. But that's not true, right? I mean, we know that's not true. If it was a failure to convey an offer, if it was a failure to convey the maximum penalties or the mandatory minimums, those are sort of the easy ones. But this is one where you're saying that this lawyer should have talked him out of going to trial. Absolutely not. That's not what I'm saying at all. What I'm saying is that she should have given him the benefit of her wisdom, which is what this court said- How do you know she didn't? Well, how do you know? Because he swore, he swore that she didn't. She said nothing other than that I said the pluses and minuses, and I told him because you won a cap, you shouldn't plead. Now, there is nothing remotely effective about that advice, not even close. But if he wanted the cap, and she gave him all the pluses and minuses, and said this will be over the cap, wasn't that important information? I mean, the fact that she said, if you want the cap, you're not going to get it here, why isn't that relevant information? I think everything is relevant about their conversations, but that's not the point. Why is that also the benefit of her wisdom? Excuse me? Why is that also the benefit of her wisdom? The pros and cons. There's no wisdom there, because we don't know what the pros and cons were. See, again, your honors, what- No, you maybe can't evaluate whether you agree with the wisdom, but that doesn't mean it isn't imparting her wisdom. No, but judge, with all due respect, if she says, as she says she says, I told him the pluses and minuses, how do you know what she said to him? See, for some reason, with respect to the judge, there is no statement of reasons why he finds Mr. Stegman incredible. With Ms. Quigley, she doesn't explain what those pluses and minuses were. We don't know if they made the slightest sense at all. You're being asked to decide this appeal based on rank speculation, rather than letting Mr. Stegman have his day in court and having a hearing, which is what he's entitled to under 2255D, unless the record shows conclusively he's not entitled to it. He's entitled to his day in court. He didn't have his day in court. It's as simple as that. If I may just take a brief moment, your honors. Very brief, you're eight minutes over. I know that. You can use your rebuttal time now. Well, if I use the remote, then the government would complain that I'm starting a new issue on my remote, on my rebuttal, excuse me. Your honor, if I may, on the- No, I mean you can use your rebuttal time now if you'd like. I'll let you, go ahead, finish your thoughts. Thank you, Judge. I appreciate that. A point four is very simple. Mr. Stegman was found to be a career criminal based in part on a 1999 Massachusetts state conviction. That Massachusetts state conviction should not have been counted as a prior conviction for purposes of the career criminal guideline because it sleeps more broadly than the federal definition of a prior drug offense. But that's an argument that's been rejected already by the First Circuit, right? Well, actually, it hasn't been rejected by the First Circuit. That was incorrect. What the people, what the government argues is that it was rejected by United States versus Montoya, a 2016 case. What the government didn't say was that what's clear from reading the record in Montoya, which we did, and which we discussed in our reply brief, was that in Montoya, the parties clearly had the indictment, which is a shepherd document. That's what they were referencing. And so that's not what the First Circuit said in Montoya. Not only is it not what the First Circuit said in Montoya, but then a year later in United States versus Bain, which we also cite, B-A-I-N, here's what they say, Your Honor. Same circuit, there is a strong reason to think that the defendant is indeed correct under our precedent that this particular section is broader than the federal definition. So not only does Montoya not support the government's view of it, because they were using shepherd documents in that case, but the very next year, they agreed with our position. And when Your Honor looks at the law, you'll see that, in fact, that's so because the Massachusetts statute covers something called bringing in, which is not equivalent to importation, which would be a prior drug conviction under federal law. So it's quite clear that we are correct, that in fact, you have to look at the shepherd documents because it's not apparent on the record. And the shepherd documents were not cited in the PSR, which the judge relied upon. It's mandated to look at shepherd documents. The court didn't look at them. But the issue is, I think, whether it was ineffective assistance not to make the argument you're now making at sentencing, right? That's the- Or on appeal. Right, okay. It's plain error, by the way. The court has said that these types of errors are plain error. This court has said that. But I saw, I guess- It was raised before the district court. You're conceding that part. This is, you're making this argument for the first time. Well, it's a claim of, well, you mean that this issue was not raised in the 2255? No, no, this was not raised before the district court. No, which is why it's claimed as an effectiveness argument. That's why we're making it as an effectiveness argument, because it should have been raised both in the district court and on direct appeal, but it was not. Counsel was ineffective. They would have prevailed. It's plain error, and they would have prevailed. So there's absolutely no reason not to find this was ineffective. We have to look at the time that you're saying he got ineffective assistance, not two years later. Sure. When that's a Bain case. Yes, but what this court has said is that where the issue is still open in the circuit, and it's a colorable issue, counsel is ineffective for not raising it if, in fact, there's a probability that it would have prevailed. In this case, I submit that not only was there a probability it would have prevailed, but it would have prevailed. In all likelihood, it would have prevailed because, in fact, the Massachusetts statute sweeps more broadly than the federal definition of a drug offense, which means you have to bring in shepherd documents to show that the defendant actually pleaded guilty to a crime which is defined as a federal drug offense. The PSR didn't cite any shepherd documents, not one. And the failure to do that in the PSR context, this court has said, is plain error. So it would have been a winning argument to make. It hadn't been decided against anybody. It was at least a colorable argument. We know it's correct. It should have been made. Thank you, Your Honor. Okay, thank you, Mr. Levitt, Mr. Dessange. Am I saying that right? Yes. My name is Rajiv Dessange, chief of the government. I'd like to just begin with the sentencing point just made. I think it's important throughout, when evaluating Mr. Levitt's claims, to look at what Mr. Stegman actually claimed in his 2255. And here, his claim is that the court and sentencing should not have relied on the PSR, but should have brought shepherd documents to show that he was convicted of something more than 14 grams of cocaine. That was the claim that he made below, that the 32E statute sweeps more broadly because it allows conviction for a very small amount of cocaine, which doesn't create distributive intent. He did not raise this claim now about bringing in or anything like that. His claim was that the judge should not have decided this issue without looking at shepherd documents. So for one thing, that means that the visibility of the Massachusetts statute is not in question. So we're not looking at case law concerning the categorical approach for individual statutes. So what this also means is that it's much easier to get rid of this claim based on the lack of prejudice. Because on a 2255, it is now Mr. Stegman's obligation to show prejudice, to show the outcome would be different. He has to present shepherd documents that show that, in fact, he was convicted of only 14 grams of cocaine. He has not done that. So he has not established prejudice for that claim. So I think on that reason, you can get rid of his sentencing claim alone. Also, there's no deficient performance here. As we pointed out, even now, 32E, the Massachusetts provision, has not been ruled out as a career predicate. So he's asking defense counsel to anticipate changes in law that haven't occurred yet. And I think it's also very important to think about the timeframe here. It's been, since 2016, it has been a continuous stream of categorical approach cases that have knocked down various predicates. But in 2016 and today, the provision at issue here, 32E, has not been struck down. So again, I don't think he shows deficient performance. Turning then to the- You were mostly relying on prejudice. Now you're going back to the first prong. Right. Yeah, and the court can decide on either prong, as is obvious. I would like to jump back to the question of Hudson and my Rule 28J letter. The holding of Hudson is not only- Can I ask a question? The 28J letter is supposed to basically tell us about authorities that are late-breaking or things that we may not know about. It's not supposed to be a second bite of the apple for a brief that was prepared months ago. These are all really old cases. Your Honor, I apologize- So why should we be even accepting a 28J letter at this point? Your Honor, that's a fair criticism, Your Honor. I have much smarter colleagues than myself who, in preparation for this argument, pointed Hudson out. I thought it was important because it is a constitutional decision that the court be alerted to it. But again, it's a fair criticism. We do not typically do this. But I thought with a constitutional issue like this, it's important to get the standard right. And that standard should just- Make sure you wanted to do everything you could to represent your client. You don't get a sir reply is the point. That is correct, Your Honor. But again, I think given the nature of the constitutional right here, I don't think we would want that to be ignored given that it's, I think, centrally relevant here. Especially to the weighing of whether, to our argument, which is on, I believe, page 53 of our brief, that when you're weighing whether to suppress evidence, the rights and the interests at stake in the unreasonable manner in which police enter are different from the suppression of evidence. And to suppress evidence on that basis, because of the unreasonable manner in which police enter, would not be a correct- Well, what Mr. Leavitt is now arguing is that this use of the flashbang is what caused the defendant to do something that he might not otherwise have done, and that resulted in the acquisition of evidence that would not have been inevitably discovered. And so that's why it's directly linked. There's a causal nexus between the improper flashbang and the acquisition of certain evidence. What's the response to that? We addressed that in the brief, Your Honor. First of all, there's not a causal link necessarily between his decision to flee and the flashbang, first of all. Second of all, we agree that the line search would not have occurred but for his flight from the house. But we argue that the discovery of the drugs would have been inevitable, given- If you look at the search warrant application, they were going to search the outlying areas of the property. They had drug-sniffing dogs. They knew that he was storing drugs and money and guns in various landscaping features outside of his house. The idea that they would not have taken drug-sniffing dogs around the entirety of his property, including the foodie property, which was mentioned in the application of the warrant, saying that we will look in the undeveloped areas even beyond this property, at the borders of it, which is where the drugs were found, I think it just belies belief. As for the recordings, I would also want to address a very brief point that he raised for the first time in his reply brief, that somehow the government is not allowed to rely on the wiretap information. He has cited the wrong provision in that case. Under 2518, 18 U.S.A. 2518 8A, this court has said that improperly sealed evidence can be used for derivative purposes. And I'm looking at the Rico case, 566 F. 2nd at 435, as well as the Emanuel case at 615 F. 3rd 129, which allowed the use of such evidence. So I just wanted to respond to that because we didn't get a chance to respond to it in our brief. Turning to the actual justification for the flashbang, I think it was well justified, given that he was armed with an assault weapon. The police were not required to interpret his statements on the recordings in the narrow way that he wanted. He said, anyone comes here, they will get shot. If someone comes to my property, they're getting laid down. And even if he only threatened to kill the person named Nikki, that's still a threat against someone entering his home when he doesn't know who they are. So the police were well within their reasonableness to use a flashbang in this case. And the court, we saw it on page 48 of our brief, numerous cases where under similar circumstances, courts have upheld the use of flashbang devices. I do want to apologize for the misstatement in our brief about whether he was convicted of this earlier assault. That was a misstatement. I should have been charged, not convicted. And I think if you look at the footnote that's directly next to that statement, it makes clear that we're talking about allegations and charges and not convictions. Turning to the advice of his attorney, I think it's important, again, it's very important to look at what he says in his 2255. What he says is that Ms. Quigley did not quote, explain, quote, any aspect of the cooperation and plea agreement to him, and did not explain what his cooperation would entail. It was to that broad statement that her affidavit is responding. And she says, I explained the plea offer to the defendant, the benefits of accepting the offer, the risks associated with rejecting the offer and going to trial. Although she does not state specifically that she told Stegman that a 12 to 14 year sentence was unlikely, she discussed what the mandatory minimum prison sentences would be if under the plea agreement. Which made clear that he was looking at 15- Well, I guess Mr. Levitt's point is that the judge, with not a very well developed record, basically opted for over the clients, and why isn't, why wouldn't it have been appropriate to have a hearing? I think, your honor, he did not abuse his discretion by not holding a hearing. He was- Well, what's the basis for finding Stegman not credible? Just because he's a convicted felon, again? No, I think, your honor, as we explained in our brief, the evidence, the record here shows that there was no support for what he was saying. The evidence, the record contradicts what he's saying. And there was ample support, documentary support- What, wait, what's the evidence that contradicts what he's saying about what? I mean, there's nothing specific here. So we're doing Judge Sharpe's job for him, which seems to be patterned. So what exactly is it that he would have written or should have written so we would understand the basis for a credibility decision? Okay, well thank you, your honor. So first of all, you have to start from this court's ruling that there's a default rule of skepticism towards these kind of claims in 2255 proceedings. That this court says that a claim that I would have accepted the plea agreement if it properly advised is not likely to be credible unless there is objective evidence supporting that assertion. He does not offer that objective evidence. His plea agreement would not have given him necessarily- So where there's a situation where we've got a conversation between a lawyer and a client. Each one is saying diametrically opposite things. It is the defendant's burden to come up with something that corroborates that. So he ought to wire up with his own lawyer? He ought to wear a wire with his own lawyer in case he ever needs corroborating evidence? No, he can point to correspondence saying I want to accept this. He can point to other types of things. He doesn't have to wear a wire. But this court has made very clear that it is not the government's burden to disprove it. It's his burden to establish this, first of all. Are you claiming though that he's waived the precise argument that he's making here? Your honor, I believe he has. I mean this is a, his claim was that she basically left the plea agreement with me in jail and left. That's his claim. And so it's, that's what Judge Sharp was confronting. Now, as far as what the record shows, Mr. Stegeman said in a representation hearing after this, that he had a conflict of interest with his attorney because they wanted him to plead. And they wanted to cooperate. That was the basis why he said I have a conflict, because I wanted to pursue suppression. And that is made amply clear through his numerous suppression motions. Even when the judge is telling him you can't act per se, you're represented by counsel, please stop. He kept doing it. And again, that is a clear contradiction to what he says now in his 2255, which is that he urged the public defender to arrange a proffer session and it was his idea to cooperate. He's essentially lying. And the judge, I think, was fed up with this. He also, I think, you have to look at the claim that somehow, after the government returned its indictment and said the plea's off the table, that somehow Quigley said we're not going to do this anymore. If you look at the email traffic between her and the AUSA, they continue to explore a plea agreement. The idea that she was saying this is not going to happen is just factually incorrect if you look at the emails. And we cite those emails in our brief. Finally, even if Quigley, all she did was advise Mr. Stegman at this first meeting to hold out for a better deal, that's not ineffective assistance of counsel. They were raising a suppression claim. That could have succeeded, which would have reduced, potentially, the charges, which would have gotten the sentence down. She was pursuing dual tracks. It's possible to plead guilty in the face of a suppression motion. You can just reserve it. It is true, Your Honor, but I don't think it's, was she not functioning as, the standard is, did she stop functioning as counsel here? Right. And the fact that she may have made a strategic miscalculation ultimately when it got, when some of the suppression motion was denied, some of it succeeded, that is not ineffective assistance of counsel. In the time that I have, I appreciate your indulgence, Your Honor. I would like to just address quickly the issue of the pretrial restraint of substitute assets. I think, our argument, and I want to focus on the prejudice problem, I think this Court should recognize that in Weaver v. Massachusetts, it made very clear that even if you allege a structural error, and that's not enough to show ineffective assistance of counsel under 2255. You have to show prejudice, or you have to show that the proceeding was fundamentally unfair. We could- Well, I guess, here's the first question I have, is just, I don't understand. What was the basis for seizing the account in the beginning? In the beginning, Your Honor, the basis was that we were going after the value of the drugs that were found on his property. All right, well, that's at the moment, that was the reason it was seized to begin with, was it was the value of the drugs? Sorry, the Greylock accounts, I'm sorry, it was as evidence. It was as evidence? Right. Okay. And so, evidence of what? Your Honor, of his drug trade. And so, what we got, Your Honor, we- I mean, a bank statement would be evidence of that. Seizing the funds would not necessarily be that. I mean, in other words, you need the actual bank account, you need to freeze the bank account to use it as evidence? Your Honor, this is, when we seized it, we believed that those were proceeds of his drug trade. And so, evidence concerning what was in that account, I think, and when we seized those accounts was fully within the rights of the government under that statute, 41-J. So that's the reason for the initial seizure, evidence and the proceeds of the drug trade, okay? And then, there's a trial, obviously, and so what about the bank account comes in at the trial, anything? Your Honor, I believe that before the trial, we actually unseized, we returned the bank account money before the trial. So, I don't think anything about the Greylock accounts came in. The money was released before the trial? It was, Your Honor, for a period, a short period. He did have access to it before trial. There was a period then, after the trial, when the jury returned its forfeiture judgments and verdicts, that it was re-seized. It was what? Re-seized? Yeah, it was re-forfeited, or forfeited. Right, as substitute assets. As substitute assets, Your Honor. And I think- Where is that in the record, that the money was returned pre-trial? Yeah, I didn't see that, but- I'm sorry, Your Honor, it's in our brief. I don't have the page in front of me, but we do cite to it in the brief. But I wanted to, on this point, point out that he has not shown prejudice from this error. Because his claim is that, well, we would have made this other sentencing issue, and again, the prejudice is just about the sentencing. We're talking about a narrow period after the trial, before judgment was entered, when he couldn't access these funds. And his claim is that, well, another attorney would have made a much better sentencing argument. Again, that's too speculative. Well, it's got to be more than that. It's got to be that he was deprived the counsel of his choice. Right, that's a structural error, but you have- Well, I mean, but the mere fact that you now have money doesn't mean you're necessarily going to retain a lawyer of your choice. I mean, there's no discussion, there's nothing in the record I saw to suggest that he had lined up or had even contemplated who that lawyer might be. He asked for new counsel after Quigley sought to be relieved, right? Right, and he sought new counsel because of falling out with her about his desire to keep pressing suppression claims. But there's nothing in the record to indicate that he has a lawyer in mind. No. And so it seems to me what Mr. Levitt is suggesting that if he'd had the money in his pocket, well, who knows, he would have lined up a lawyer. But there's nothing I'm going to ask him about that. But I didn't see anything in the record to suggest that's the case. Because there is none, Your Honor. And again, I think also the timing is important. In terms of his Sixth Amendment claim, the attorney should have known this violated the Sixth Amendment. That was not decided in Lucas until three months before sentencing. That was well after he had been appointed counsel. And there's no indication that he had any desire at that point to change attorneys. He was, his defense counsel from the Public Defender's Office had represented him vigorously and made, had adopted a suppression argument that he wanted to make. There was no indication there was any kind of problems that he was having or had any desire to switch attorneys when the Sixth Amendment claim that he's suggesting the attorney was ineffective for not making suddenly became viable in Lucas. Well, I guess I'm still trying to figure out the timeline in terms of when these funds were released and when they were re-seized relative to the motion for Quigley's motion to be relieved. So she sought to be relieved, I believe, in September of 2015, which was after the verdict. And so this is in a period when the Greylock funds were then subject to the jury's decision. But before trial, and I believe it must, I want to say about a month or two before trial, and the trial was in August of 2015, we returned the money in the Greylock accounts. And so that is the period we're talking about. And his claim, his ineffectual assistance claim is focused on this post-trial pre-judgment period. Because defense counsel on appeal then did challenge the forfeiture and successfully. So that's the narrow period that we're talking about. Your Honor, I'm well over my time, unless there's other questions. No, we'll leave it at that, okay? Thank you very much, Mr. Dosage. We'll now hear from Mr. Leavitt for two minutes. Yes, thank you, Your Honor. Maybe begin with that last point, Mr. Leavitt. Yeah, first, I don't know where this is coming from, that the Greylock money was released. I'm not aware of that. He certainly was never returned to him physically, so I'm not sure what they're referencing. I just don't know. I mean, physically, it was in a bank account, right? Yes, but as far as I know, that money was not released to Mr. Sagan for his use. I just don't know, so I can't say. Okay, with regard to your question, Your Honor, whether or not he had lawyers signed up or available or lined up. What he said at the change of attorney hearing was that, I don't have any money to hire a lawyer. But what he said was he wanted an appointed counsel, and the judge said, why don't you just get your own counsel, because you're playing such monkey business with lawyers. And so, he said, I don't have any money. Right, right. But, I mean, that was an argument, so don't make me get my own lawyer, just appoint me a lawyer. Well, it's not a question of don't make me get my own lawyer, don't make me get what I can't get. But, it seems to me you're asking us to infer that if he'd had the dough, he would have gotten himself a new lawyer. And I don't see any basis to, that seems purely speculative to me. It's not a situation like most, let me just finish, like most Sixth Amendment cases, where somebody's got a lawyer and they're told you can't have that lawyer because we've freezed your funds or because there's a conflict or whatever, it's not that, right? Well, I. There's no lawyer that is in the wings. No, no, there's no lawyer in the wings, but he retained counsel when he could, and then he couldn't. You know, and- So, you're just asking us to make the assumption that because he had originally had retained counsel, he would have continued retained counsel, but for the seizure or the freezing of the funds? I think that's a very reasonable assumption, but I don't think you would, I don't think this should. Speculative, is it not? Excuse me? It's speculative. That's right, you know, it's speculative, and the reason, Your Honor, it's speculative, we all know. And the reason it's speculative is because we were denied a hearing. So, we should have had a hearing, there should have been testimony concerning this issue, concerning the flash bang issue, concerning all the other issues, but there wasn't a hearing because it was improvidently denied. And now, Your Honors are being asked by the government to essentially fill the gaps, to say the heck with the process. You didn't raise this issue, though. Excuse me? You didn't raise this issue initially. You only raised it on reconsideration, correct? Well, I didn't, that was another problem, and if I can explain. We came into the case and asked Judge Sharp, after Mr. Stegman's motion was denied, we asked Judge Sharp whether or not we could supplement the record as his new counsel, and that request was denied. If we had been permitted to do so, the record would be more complete. But to the extent that the salient facts have not been fleshed out, they haven't been fleshed out because Judge Sharp improvidently denied a hearing and laid all this, frankly, on you. With regard to whether or not we waived the fourth issue, issue D, concerning whether- I'm sorry. Excuse me? What's the fourth issue? The question of whether or not he's a career criminal. Thank you. With regard to that issue, the government says, well, that was waived because Mr. Stegman was challenging whether or not he had intent to distribute, whether or not it was more than 14 grams of cocaine that he was convicted of. But in fact, what Mr. Stegman did was, he said that this statute, 32E of the Massachusetts Code, sweeps too broadly, and he said that the government had to come forward with Shepard documents. That's exactly the same argument we're making now. The only difference, the only difference is that we're saying it swept too broadly because the statute encompasses a bringing in, which is not the equivalent of importation. But we're making the same argument that it sweeps too broadly. We're making the same argument concerning the lack of Shepard documents. And remember that Mr. Stegman was proceeding pro se, and again, we tried to supplement the record when we came into the case, and we were denied that opportunity. Finally, the government says, well, it was Mr. Stegman's job to produce the Shepard documents, to show prejudice. Number one, it wasn't his job, it's the government's job to produce Stegman, Shepard documents. And when they don't, in this circuit, it's plain error. But number two, he did present the Shepard documents. They're in the record, we discussed them, we specifically cite document 47-5 at pages two to seven, where he included the available documents that he had, including the indictment of a cover sheet, which shows that he was convicted of only the generic offense, not an offense which would bring this within the definition of a prior drug conviction under the guidelines. Thank you, Your Honor. All right, thank you both. We certainly got our money's worth in terms of time, but also effort, and thank you very much. It was helpful.